Magistrate Judge Peterson

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) **NO. 20-148JLR** |
| v. | ) |
| | ) **MOTION/MEMO IN SUPPORT OF** |
| | ) **RELEASE ON CONDITIONS** |
| | ) |
| KELLY T. JACKSON, | ) |
| | ) |
| Defendant. | ) |

Defendant Kelly T. Jackson, by and through his attorney, Robert Goldsmith, hereby MOVES this Court to release him on conditions, including location monitoring, counselling requirements, alcohol/drug testing, residential and travel restrictions, parental supervision, and other conditions, specified below.

## PROCEDURAL BACKGROUND

Kelly Jackson was arrested on September 9, 2020, on a Criminal Complaint, filed on September 2, 2020, in this case. He appeared before the court that day, and requested that the detention hearing be put over. It was re-scheduled to September 15, 2020. The Government moved for detention, invoking the rebuttable presumption on the ground that the arson charges are included in 18 U.S.C. § 2332b(g)(5)(B). On September 10, 2020, Jackson was formally charged in a four count Indictment.

MOTION - 1

ROBERT W. GOLDSMITH
*Attorney at law*
705 Second Ave.
Seattle, WA  98104
(206) 623-1592

## FACTUAL BACKGROUND

### Criminal allegations

The Indictment charges two counts of Unlawful Possession of a Destructive Device in violation of 26 USC §§ 5861(d) and 5845(a)(8), and two counts of Arson in violation of 18 USC §§ 844(f)(1) and 844(i).  The Arson counts carry a five-year statutory mandatory minimum.

The alleged incident on May 30, 2020, occurred at a demonstration in downtown Seattle, following the police murder of George Floyd on May 25, 2020.  Video of Floyd's fatal encounter with police sparked protests over police violence all across the country. *See* Larry Buchanan et al., "Black Lives Matter May Be the Largest Movement in U.S. History," N.Y. Times (7/3/20), (possibly 15 million to 26 million people participated in the protests, making them potentially "the largest movement in the country's history." https://www.nytimes.com/interactive/2020/07/03/us/george-floyd-protests-crowd-size.html.

According to the Complaint, on May 29, the defendant's phone contained a screenshot of the demonstration set for May 30.  Dkt 1, ¶ E, p 17.  The next day, "On May 30, 2020, at 11:47 a.m., a screenshot was captured containing information from the website mtlcounterinfo.org, including a list of "Ingredients" used to manufacture a Molotov cocktail."   ¶ E, p. 18.  The defendant is alleged to have thrown two Molotov cocktails at or into two unmarked, unoccupied police vehicles.  The first two counts occurred at 4:04 p.m., where the Complaint alleges that Jackson threw what "appears to be a glass bottle with an ignited fabric or paper wick" through the open driver's side of the vehicle."  ¶ C, p. 9.  Just two minutes later, this same vehicle "was heavily damaged and burned by the actions of Margaret Aislinn

MOTION - 2

Channon[1] and other suspects who are currently unidentified." ¶ C, p. 9. The second two counts happened at about 5:20 p.m., where the bottle was thrown at the vehicle but bounced off the windshield and landed on the pavement.  ¶ C, p. 10.  All four of the counts alleged occurred within four – five hours after the download of the Molotov cocktail instructions.

### Criminal History and Employment

The Pretrial Report lists several misdemeanor convictions as well as pending burglary charges in Snohomish County.  All of these cases are either closed or were scheduled to be resolved by placement in a treatment alternative.  Before the indictment, Attorney Geoffrey Burg wrote: "Those cases have a "global resolution" where he is entering Snohomish County's Therapeutic Alternatives to Prosecution (TAP) program. Should we still be able to resolve those matters, he will have resolved every pending charge that he is facing." (Letter and treatment report attached in Exhibit 1, filed under seal.)  However, that resolution has been suspended just today.  Nonetheless it must be noted that none of those prior offenses involved violence or a threat of violence.

Pretrial reported that he has worked for Jim Dandy Sewage and Plumbing for the last six months and before then at the Stevens Pass ski resort.  This is corroborated by Thomas Jackson, Kelly's father. (See letter of Thomas Jackson, attached in Exhibit 2, filed under seal.)

### Family Ties

The Pretrial Services report confirmed that Kelly Jackson has significant and long-term family ties.  He has lived with his parents and siblings at the same address in Edmonds, WA, his whole life.  He has many positive, community ties, as evidenced by the plethora of support letters we could collect in

---

[1] Ms. Channon is charged in a 7 Count Indictment, CR20-129JCC, with five of those counts as Arson, all with the same five year mandatory minimum, involving five separate police vehicles.  She was released on conditions on July 15, 2020 in that case.

MOTION - 3

less than a week.  (Attached in Exhibit 3.)

LEGAL ARGUMENT

1.  BURDEN OF PROOF AND PERSUASION.

A court may detain a defendant pending trial only if it determines that no "condition or combination of conditions will reasonably assure the appearance of [the defendant] . . . and the safety of any other person and the community." See 18 U.S.C. § 3142(f).  Here, probable cause supports the allegation that the arson counts trigger the statutory presumption under 18 U.S.C. § 2332b(g)(5)(B)—that no conditions will reasonably assure the defendant's appearance or the community's safety. 18 U.S.C. §§ 844(i), 2332b, 3142(e)(3)(C). This statutory presumption shifts the burden of production but not the burden of persuasion. *United States v. Jessup*, 757 F.2d 378, 386 (1st Cir. 1985).  The government bears the burden of persuasion as to danger, by clear and convincing evidence. *United States v. Diaz-Hernandez*, 943 F.3d 1196, 1198 (9th Cir. 2019). And as to flight, its burden is by a preponderance of the evidence. *United States v. Gebro,* 948 F.2d 1118, 1121 (9th Cir. 1991).

II.  STATUTORY FACTORS

Under 18 U.S.C. § 3142(g) the court assesses the risk the defendant might flee and the danger the defendant might pose, by considering these factors: (1) the nature and circumstances of the offense; (2) the weight of the evidence; (3) the defendant's personal characteristics and history; and (4) the seriousness of the danger the defendant may pose to the community upon release.

**Flight risk**

Kelly Jackson presents virtually no risk of flight. He is a lifelong, permanent resident of Edmonds, WA, and has nowhere else to go.  Although he has traveled as far as Africa, that trip, as well as the trip to Costa Rica and Canada, were all group or family trips.  A long-time family friend, Rob Turner, writes

MOTION - 4

about their shared African experience in his letter.  (Attached in Exhibit 3.)  Thomas Jackson has located Kelly's passport and will turn it in to the Court as soon as practical, if necessary.

The Pretrial Report lists a few warrants, but none of them involved an intentional failure to come to court.  At least one of the warrants involved a miscommunication with his public defender.  More importantly, all three of those warrant cases from Edmonds Municipal Court in 2017 and 2018 were ultimately dismissed!  Obviously, the courts did not hold his supposed failures to appear against him. Those warrants do not reflect the way Kelly currently deals with his court dates.  According to Mr. Burg, "I am writing to let you know that he has been responsible in showing up for court each and every time he has been ordered by a judge. By my count, we have had fifteen court appearances in four different courts and he has never missed a date and has always been on time." (Exhibit 1, filed under seal.)

In sum, the preponderance of the evidence does not support finding that Kelly is a flight risk.  If anything, we have shown he is not one.

**Danger**

**1. The nature and circumstances of the offense.**

We cannot debate the seriousness of the alleged offenses.  However, the context of the offense is unique.  For one thing, other people were also doing it.  That does not excuse any destructive behavior, but it created an atmosphere where such conduct could be copied and even perversely, applauded.  The allegation of 'planning' for this occurred on the same day, just hours before the alleged acts. That being said, it appears to be more of an impulsive, emotional act of an immature, 19 year-old, who may have been acting out from his bipolar disorder, than a premeditated and 'rational' decision.  What is more, he is not charged with attacking a police officer or any other person but with damaging two unoccupied, unmarked police vehicles. As Judge Coughenour in his Order of Release in the very similar, Channon case (CR20-

MOTION - 5

129JCC, dkt. 35, pp 6-7) recently wrote:

> Instead, Channon is charged with destroying property in what appears to have been an act of political protest during perhaps the largest outcry over police violence in history . . . Channon's alleged act of protest—an act that many engaged in around the country4—was illegal. It was also dangerous both physically and because it contributed to the type of tense, hostile atmosphere that is often a recipe for violent clashes between police and protesters. See Edward R. Maguire, New Directions in Protest Policing, 35 St. Louis U. Pub. L. Rev. 67, 91–96 (2015) (detailing how crowd and police dynamics can lead to violence during protests). But Channon's alleged act of protest does not show that she is so dangerous that she must be locked up *before* she is convicted. [emphasis in original.]

There is no evidence whatsoever that Kelly did anything else destructive nor that he even attended any other protests, whether violent or peaceful, since May 30.  In fact, he was mostly working at his plumbing job.

**2. The weight of the evidence.**

The government will inevitably emphasize the alleged facts of the crime but cannot rely on any alleged acts of specific violence directed toward persons.  It is axiomatic that "[t]he weight of the evidence [which] is the least important of the various factors" to determine danger.  *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985).   In this case, the alleged dangerous behavior does not prove the alleged perpetrator is so dangerous as to need to be locked up immediately.  *See, for example, United States v. Flores*, 856 F. Supp. 1400, 1401 (E.D. Cal. 1994)(releasing over government claim of danger an alleged member of a local anti-African American gang, "the Brotherhood," who was alleged to have participated in a severe battering of an African-American for no apparent reason other than racial animosity.)

**3. The defendant's personal characteristics and history.**

No one who knows Kelly Jackson considers him a violent or dangerous person.  (Exhibit 3, Community Letters.)  In actuality, he is a kind hearted person with great empathy for others.  Rob Turner, who was with him in Africa, writes:

MOTION - 6

Perhaps the best example of the good heart Kelly has, came from our time in Zambia together building a house for a local family in desperate need. I knew he was a hard worker from my time volunteering with him for the various sports leagues we were involved with back home. I also knew he was kind and polite to those around him. However, the passion and love he showed to the dozens of local children that would show up at our building site everyday was extraordinary. After working hard digging, hauling bricks and mixing concrete in 90+ degree temperatures, he would tirelessly entertain and play with the throngs of children for hours. The pure joy he provided for these children and the love they showed back to him will always be etched in my memory. This trip showed his passion for helping those less fortunate and in need. (Exh. 3 at p. 36 of 50.)

Also see the letter of Jessie Strauss (Exh. 3 at p. 31 of 50.)

Ironically, it is perhaps his empathy for others that was twisted into a volatile reaction to the murder of George Floyd in that unusual, heated atmosphere that ensued. Although a mother will always defend her son, Maria Jackson's comments get to the heart of the matter: "As his mother, I have known Kelly his entire life. I believe this act was totally out of character, and signifies a dramatic departure from all previous behaviors. . . It has become apparent to his father and I, that Kelly's behavior was a result of a manic episode. Bipolar episodes are cyclical and escalate. This episode and his actions were uncharacteristic and departed dramatically from all previous episodes." (Letter of Maria Jackson, attached in Exhibit 2, filed under seal.) See also, report from Nsight (Exh. 1) and sister Jillian's letter (Exh. 3 at p. 41 of 50) corroborating this.

The letters from relatives, friends and several teachers in Kelly's community all point out his good heart, his wonderful supportive, family and how shocked and surprised they were by these accusations. (Exhibit 3.) The letter from Ken Engblom is particularly telling:

Today I read an article about an Edmonds man arrested for arson during the May riots in downtown Seattle. My emotions have run from anger to sadness over this whole past four months, but when I read that it was Kelly my heart sank. Anyone who knows me knows I have little tolerance for people acting violently in the name of protests. I have no respect for the actions of the mobs over the past months, and believe that everyone is responsible for their own actions. That being said I would like to say what I know about Kelly Jackson. . . Kelly has always acted with not a lot of thought about consequences. He is a person who acts first, and assesses later, but I have never known him to have evil intent. Kelly has a lot of love in his heart. (Exh. 3 at p. 32 of 50.)

MOTION - 7

The fact is, he has been in the community from May 30 to his recent arrest over three months later, without further trouble.  He's been working with his attorney, Geoffrey Burg, to address his other legal problems.  He has been attending his treatment requirements since then (August report in Exh. 1) as well as working hard as a plumber.  He has continued to live with his parents.  And, by the way, since his license to drive was suspended on August 4, 2020, he has not been driving. In short, the alleged offenses actually bear all the features of a 'one-off' aberration.  Other courts have recognized this in releasing others accused of similar crimes.  See Exhibit 4, chart of similar cases.

**4. The seriousness of the danger the defendant may pose to the community upon release**.

Since the alleged offenses are the product of a unique moment in history and due to his bipolar disorder, we will address that squarely.  To manage any possible risk, we are proposing the following special conditions for release: surrender all current and expired passports and travel documents; restrict travel to the Western District of Washington;  do not attend any protests or demonstrations; reside at family home; his father will serve as third-party custodian; curfew; participate in the location monitoring program with Active Global Positioning Satellite technology; alcohol/drug testing and treatment; mental health counselling; Pretrial supervision; along with standard conditions.   We believe these strict conditions monitored by his family will offset any risk he may pose to the community.

Even though we cannot in good faith guarantee success, that is not the legal standard.  *See, for example, United States v. Tortora*, 922 F.2d 880 (1st Cir. 1990)(held that a district court need only find evidence of an "objectively reasonable assurance" of community safety before release is appropriate for a person described by the government as a danger to the community.)  To be sure, the conditions we have outlined provide that assurance.

MOTION - 8

**ROBERT W. GOLDSMITH**
*Attorney at law*
705 Second Ave.
Seattle, WA  98104
(206) 623-1592

**Constitutional Considerations.**

During the COVID-19 crisis, speedy trials have been stayed, extending the time before trial or resolution. The pandemic also delays all manner of consultation, discovery review and the other activities counsel along with their clients engage in. If he is detained, he will be held in either strict quarantine— locked in his cell for 24 hours a day—or later, only allowed out for about four hours a day, spending most of his time waiting in line for showers or phones. While detained at Seatac, he will not be undergoing treatment, counselling or getting any help. This exacerbates the harsh punishment and disadvantages of being held in detention before trial. Since March, counsel has not been able to even see detained clients and must rely on the vagaries of FDC Seatac in giving phone calls to them. All of this implicates the defendant's Sixth Amendment right, the right to speedy trial and to due process.

## CONCLUSION

We have produced 'some credible evidence forming a basis for our contention that Kelly Jackson appear and not pose a threat to the community in order to rebut the presumption.'" *United States v. Chen*, 820 F. Supp. 1205, 1207 (N.D. Cal. 1992) (internal citations omitted) (quoting *United States v. Thomas*, 667 F.Supp. 727, 728 (D.Or.1987)). "Only in rare circumstances should release be denied . . . [citations omitted] and doubts regarding the propriety of release should be resolved in the defendant's favor." *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985).

For these reasons, there is a sufficient basis to release Kelly Jackson on supervision with the special conditions outlined above and the other standard conditions.

.        DATED this 14th day of Sept., 2020.              Respectfully submitted,


/S/ *R. Goldsmith*

MOTION - 9

ROBERT W. GOLDSMITH
*Attorney at law*
705 Second Ave.
Seattle, WA  98104
(206) 623-1592

Robert Goldsmith
Attorney for Defendant
Email: bobgoldsmith52gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 14tht day of Sept., 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.

Notice of this filing will be sent electronically to all parties of record.

DATED this 14th day of Sept., 2020.

_/s/ R. Goldsmith_____
Robert Goldsmith, WSBA # 12265
Email: Bobgoldsmith52@gmail.com
Attorney for defendant

MOTION - 10

**ROBERT W. GOLDSMITH**
*Attorney at law*
705 Second Ave.
Seattle, WA  98104
(206) 623-1592