Judge Robart

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| | ) | NO. CR20-148JLR |
| Plaintiff, | ) | |
| v. | ) | DEFENDANT JACKSON'S |
| | ) | SENTENCING MEMO |
| | ) | |
| KELLY T. JACKSON, | ) | |
| | ) | |
| Defendant. | ) | |

**RECOMMENDATION**

24 Months in Prison, (request recommendation for camp at Sheridan, OR);
Reporting date: two weeks after defendant is vaccinated;
Three Years Supervised Release; and
Restitution.

**BASIS FOR RECOMMENDATION**

On January 6, 2021, defendant Kelly Jackson entered a plea to two counts of possession of a destructive device in violation of 26 U.S.C. §§ 5861(d) and 5845(a)(8). These crimes carry a maximum of ten years in prison. We agree with U.S. Probation's calculation of the Guideline which yields a non-mandatory range of 46 – 57 months. As part of the plea agreement, the Government will be moving to dismiss the arson charges in counts 2 and 4.

SENTENCING MEMO - 1

**ROBERT W. GOLDSMITH**
*Attorney at law*
705 Second Ave.
Seattle, WA 98104
(206) 623-1592

**Personal History and Characteristics of the Defendant.**

At the time of the offense, Kelly Jackson, age 19, still resided with his parents in their home in Edmonds, WA, as he does now. In fact, other than in treatment centers, he has never lived anywhere but with his parents. He grew up in Edmonds, attended and graduated from Edmonds Woodway High School in 2018. He played football and skied, injuring himself seriously several times. (See Evaluation by Dr. Kenneth Muscatel, filed under seal in Exhibit 1, who goes into more detail about the effects of the various injuries.) On the surface, his childhood was not terribly abnormal, but a deeper look reveals serious issues. His older brother, like Kelly, suffers from bipolar disorder and that created some traumatic scenes in the family, among other issues noted by Dr. Muscatel and the Probation Report at ¶¶ 59-61.

Kelly's own troubles were compounded with early marijuana usage and later alcohol abuse. This led to multiple run-ins with the law as noted in the Probation Report, which lists several misdemeanor convictions as well as pending burglary charges in Snohomish County. Significantly, none of those prior offenses involved violence or a threat of violence to any individuals. All of them, however, are clearly connected to his bipolar disorder. As well, it should be noted that his drug/alcohol abuse is intertwined with his bipolar disorder. However, he was not under the influence of drugs or alcohol on May 30, 2020.

Well before May 30, 2020, Kelly Jackson had been diagnosed as suffering from bipolar disorder and had been treated for it. Unfortunately, he did not maintain his medication, which is often the case with immature, mentally ill individuals. In between episodes of his bipolar disorder, he was able to work a job and maintain a semblance of normality.

SENTENCING MEMO - 2

Notably, after the incident on May 30, 2020, and before his arrest in this case in September, he resumed his full-time work at Jim Dandy Plumbing as a plumber's apprentice. Nearly a month after his arrest, he was released to an inpatient facility in Tucson, AZ, and thereafter he spent time at a residential facility in Tacoma. (See Dr. Muscatel's report, letter of therapist Jeremy Johansen, and Sierra Tucson Discharge Letter in Exhibit 1 for more detail.)

Upon returning to his parents' home in Edmonds, he obtained employment at the Stevens Pass ski center, where he continues to work. As his father writes: "He could have easily worked his outpatient and awaited the final process. As soon as he could, he applied and got a job working at Stevens Pass. Working is very important to him. He wanted to pay for his court fees and expenses owed as much as he can. He signs every check he makes over to his mom and I. He balances a lot of work hours that includes up to 3 hours a day commuting to and from our house, with his continued outpatient program. As an employer, with UPS, who has watched the effects COVID has had on the work force, I am amazed at his commitment and effort." (Letter of Thom Jackson, attached in Exhibit 2.) His mother echoes this maturity: "I watched him continue to grow as he spent another 45 days inpatient treatment at Bayview. When he came home in December, I saw a new maturity about him. He was no longer a teenager rebelling--but an adult who was taking responsibility for his life and who felt accountable for his past actions." (Letter of Maria Jackson attached in Exhibit 2.) His recent supervisor, Ben Groff as well as a neighbors and former coaches, Rob Turner and Ken Engstrom, along with friend Cori Alexander all mention his improved work ethic and changed attitude.

Other than his manically or chemically related prior crimes, Kelly's reputation in the

SENTENCING MEMO - 3

community was one of a compassionate, decent human being.  The plethora of letters submitted for his detention hearing are worth perusing.  (See dkt. #12-1 "Community Letters.)  One such writer, Ericka Jae Engblom, aptly describes this young offender: "Despite his questionable actions, I don't believe for one second that his intentions are ever malicious, he is simply a young man with an overdeveloped sense of justice. Regarding the events of May 30, I would like to remind you of a scientific fact, that the frontal lobe of the human brain is not finished developing in males until around the age of twenty-six. This can assist young men of Kelly Jacksons age in making boneheaded decisions. I would ask that when making your decisions regarding his sentencing you keep that in mind."  (At p. 7 of 50 of dkt .#12-1.)  Kelly will not be 21 until this June.  He has progressed significantly since his arrest last September.  Perhaps, maturity is taking hold.  There is a reason why the age of 21 was considered the onset of adulthood for so long.

His maturity and progress since his arrest is heartening.  As U.S. Pretrial in their Release Status report notes: "Mr. Kelly Jackson commenced supervision on November 10, 2020 and has made significant progress with his sobriety and mental health issues, as well as his life in general. . . . He remains in an intensive outpatient treatment program at Bayview Recovery, and the reports have been positive. The defendant has consistently tested negative for all controlled substances."  (At p. 2 of 3/18/21 Report.)  As a result, Pretrial has recommended voluntary surrender.

**Nature and Circumstances of the Offense:**

The incident on May 30, 2020, occurred at a demonstration in downtown Seattle, following the police murder of George Floyd on May 25, 2020.  Video of Floyd's fatal encounter with police sparked protests over police violence all across the country. *See* Larry Buchanan et al., "Black Lives

SENTENCING MEMO - 4

Matter May Be the Largest Movement in U.S. History," *N.Y. Times* (July 3, 2020), (possibly 15 million to 26 million people participated in the protests, making them potentially "the largest movement in the country's history.)"[1]

We do not disagree with the description of the offense that Probation summarized. However, his "planning" was actually done on the day of the protest. Kelly downloaded the information to make the Molotov cocktails the morning of the incident on May 30, 2020. As p. 17 of the Government's Complaint in this case notes: "On May 30, 2020, at 11:47 a.m., a screenshot was captured containing information from the website mtlcounterinfo.org, including a list of "Ingredients" used to manufacture a Molotov cocktail." Immediately upon throwing the first bottle, the crowd cheered for him. And shortly thereafter, another person stepped in and squirted an accelerant at the squad car which re-ignited the flames. (This is documented by a video, provided in discovery—Bates stamp 2261.) What is more, the second police vehicle was also heavily damaged and abandoned when Kelly threw the one that bounced off the windshield.

There is no question that the anger of the protesters and the wild crowd itself had an effect on this young man. Dr. Muscatel noted this as well: "The crowd likely exacerbated his emotional dyscontrol, agitation, and also increased the likelihood that he would act impulsively. He likely was hearing people urging him on and becoming excited by his potential actions. It is likely that the second incident was potentiated and exacerbated by the first incident, making it more likely that he would act upon those impulses." (Evaluation, at p. 23., in Exhibit 1, file under seal.)

In the end, as Dr. Muscatel has opined, regarding the crimes: "There is no question that he

---

[1] https://www.nytimes.com/interactive/2020/07/03/us/george-floyd-protests-crowd-size.html.

SENTENCING MEMO - 5

was in the midst of a manic episode, as his treatment before and after the incident demonstrate." (Evaluation, at p. 23., in Exhibit 1, file under seal.)  Probation also concurs that: "his underlying mental disorder played some role in his actions that day."  (At p. 3 of 5 of Recommendation of U.S. Probation.)

The Government argues that his premeditation on the day of the protest shows that his actions were not the product of his mental health.  That statement is not supported by any expert opinion or even scientific citation.  It is a bald assertion that is contrary to what Dr. Muscatel found and what the Probation Officer concluded as well.  The Government prosecutor did not spend hours talking to Kelly as Dr. Muscatel and both Probation and Pretrial did.  In fact, the Government never had any conversation with Kelly whatsoever.

Their sentencing memo is a re-hash of the Complaint in this case.  In fact, like the Complaint, their sentencing memo cites the poster found in Kelly's sister's bedroom (at p. 6 of dkt. 50) over three months after May 30 (at his arrest in early September.)  In fact, Kelly's sister moved in later that summer after her college year, and put the poster up **after** Kelly had thrown the bottles.  She was not aware of what Kelly did and it certainly had no influence on what he did since it was not in the house on May 30. (See attached letter of Jillian Jackson.)

To summarize, an immature 19 year-old, who was heavily influenced by a charged atmosphere following the murder of George Floyd, and later, an unruly crowd, and who was in the middle of an untreated, uncontrolled manic episode, threw two Molotov cocktails at abandoned and already damaged police vehicles.  It was a reckless act of property destruction, which was not intended to harm any individual, and in the end, harmed Kelly Jackson more than anyone.

SENTENCING MEMO - 6

**Just punishment, adequate deterrence, protection of the public, and respect for the law**

There is no question that punishment is in order. This Court has the power to give him a sentence from credit for time served to the maximum of ten years. The Government has recommended the high end at 57 months and Probation has recommended 36 months. We are recommending 24 months. Whatever length prison sentence the Court decides on will adequately deter Kelly given his progress; it will deter others and send a message to the community about the seriousness of Kelly's actions.

From the public's point of view, the criminal justice system is one entity. The message to the community at large is not filtered by jurisdiction. Although this Court need not consider what he might be facing in State court, it is instructive to look at another type of protest case. If, for example, he had actually**, intentionally** assaulted people with bear spray[2] and then threatened journalists while armed with an assault rifle, he might be in State court, facing less than a year in jail. That is what happened in Thurston County Superior Court. There, a defendant, who pled to three counts of third-degree assault, two counts of harassment and one count of criminal trespass for spraying three people with bear spray and threatening two journalists while armed with an assault rifle at a State Capitol Campus protest, was sentenced to six months.[3] Five different people were frightened, hurt, and possibly terrorized by the defendant's intentional actions. That is a different crime than here, arguably worse.

---

[2] Bear spray may have contributed to the death of Officer Sicknick in the Capitol riot on January 6, 2021. *The Washington Post*, March 19, 2021, at https://www.washingtonpost.com/lifestyle/wellness/bear-spray-pepper-riot-dangerous/2021/03/19/053c3870-87fb-11eb-bfdf-4d36dab83a6d_story.html

[3] *The Seattle Times*, March 15, 2021, at https://www.seattletimes.com/seattle-news/crime/judge-sentences-man-accused-of-threatening-reporters-in-olympia-during-jan-6-protest/.

SENTENCING MEMO - 7

In comparing the *mens rea* of the two incidents, one is intentional, the other reckless,[4] which at common law places Kelly's crime at a lower rung of culpability.[5] To the community at large, the contrast in message is stark: attack abandoned, damaged property and the sentence is in years; attack people and the sentence is in months. To be sure, throwing two Molotov cocktails could have resulted in injury or worse, but it was not directed at people and in the end, it was a reckless act not an intentional act of violence. We ask the Court to consider that the community at large may see things this way.

## CONCLUSION

What Kelly Jackson did was wrong. He fully admits that—see his attached letter. But he did not intend or want to harm a soul. His actions were the direct result of an untreated bipolar disorder, his immaturity, the emotional reactivity of youth, and it must be considered a property crime, albeit a reckless one. For the foregoing reasons, we request the Court sentence him to 24 months.

Dated March 23, 2021.                                      Respectfully submitted,

/s/ *R. Goldsmith*
Robert Goldsmith, WSBA #12265
Email: Bobgoldsmith52@gmail.com
Attorney for Defendant

---

[4] Technically the *mens rea* here is the 'knowing possession' of the destructive devices. But his action in throwing them was clearly reckless, *i.e*, it was not meant to harm anyone but was heedless.

[5] "Thus, a crime committed purposefully would carry a more severe punishment than if the offender acted knowingly, recklessly, or negligently." At https://www.law.cornell.edu/wex/mens_rea.

SENTENCING MEMO - 8

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of March, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent electronically to the Assistant U.S. Attorney, counsel of record for the Government.

DATED this 23rd day of March, 2021

.

/s/ R. Goldsmith
Robert Goldsmith, WSBA # 12265
Email: Bobgoldsmith52@gmail.com
Attorney for defendant

SENTENCING MEMO - 9

**ROBERT W. GOLDSMITH**
*Attorney at law*
705 Second Ave.
Seattle, WA  98104
(206) 623-1592

Judge Robart,

    My name is Kelly Jackson I am 20 years old. I am writing this letter today because I have wronged the society I live in. What I did was irresponsible and reckless, and for this I am ashamed. I am here today to take full responsibility for my actions and the repercussions that come along with them. This is why I have plead guilty and this is why I stand before you today.

Respectfully,
Kelly Thomas Jackson

To whom it may concern,

    The poster referenced in the report does not belong to Kelly, it belongs to me Jillian Jackson. At the time the crime was committed, May 2020, I didn't live with Kelly nor was I aware of what crime he had committed. When I moved back to Edmonds in September and hung up the poster I was still unaware of the crime Kelly had committed. I purchased it from an artist on instagram who was donating the profits to bail funds for people arrested at marches not because I support or condone destruction of property.

Respectfully,
Jillian Jackson